## Alexandria

## VICTOR GEORGE GRITES, JR.

v.

## COMMONWEALTH OF VIRGINIA

No. 0329-88-4

Decided September 12, 1989

COUNSEL

Thomas D. Logie, for appellant.

M. Katharine Spong, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KOONTZ, C.J.**—Victor George Grites, Jr., was convicted in a jury trial in the Circuit Court of Shenandoah County of obtaining money by false pretenses in violation of Code § 18.2-178. In accordance with the jury verdict he was sentenced to a term of six months in jail and a fine of $1,000. On appeal, Grites challenges the sufficiency of the evidence to support his conviction. For the reasons that follow, we reverse that conviction.

"When considering the sufficiency of the evidence on appeal of a criminal conviction, we must view all of the evidence in the light most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly deducible therefrom. The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it." *Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988)(citations omitted). However, in applying this standard of review we cannot disregard credible, unimpeached evidence of the Commonwealth which exculpates the accused and creates a reasonable doubt of his guilt. *See Harward v. Commonwealth*, 5 Va. App. 468, 479, 364 S.E.2d 511, 516 (1988). Upon these principles we review the evidence which was adduced entirely from the witnesses for the Commonwealth in this case.

In April 1987, John MacMahon and his father, Dr. MacMahon, desired to purchase a log cabin from Grites. The cabin had been dismantled and the logs were stored on the property of the owner, Leo Bernstein, in Middletown. The parties contemplated that the logs would be removed from their present location by Grites and assembled on Dr. MacMahon's property.

The pertinent events leading to the charge against Grites occurred primarily between Friday evening and Monday morning of the weekend beginning on April 24, 1987. On that day, John MacMahon gave Grites a check for $3,000 drawn on a Sovran Bank account by Dr. MacMahon for the purchase of the cabin. MacMahon instructed Grites not to cash this check until the logs for the cabin were delivered to the MacMahon property. Notwithstanding these instructions, Grites attempted to negotiate this check the same day at the Middleburg National Bank. Upon being advised that the bank would not cash this check without the approval of the bank's senior vice-president, John Palmer, Grites

left the bank and contacted Mrs. Anne MacMahon, John's mother and Dr. MacMahon's wife.

Grites told Mrs. MacMahon that the bank would not cash Dr. MacMahon's check and asked her to exchange Dr. MacMahon's check for one of her checks drawn on her Middleburg Bank account. Mrs. MacMahon met Grites at the Middleburg Bank shortly before its closing hour and exchanged the checks. Mrs. MacMahon was aware her son and husband desired to purchase a log cabin from Grites and that her husband had given her son a check payable to Grites for this purpose. When she exchanged the checks she also was aware that "[Grites] needed the cash for the next morning (Saturday), very early the next morning for the laborers to dismantle the cabin and return it, put it on a truck and bring it to our farm. [She] could not find John, nor his father, they both wanted this cabin, so . . ., [she] went up and exchanged checks with Mr. Grites, gave him a Middleburg check and took back Dr. MacMahon's check." Mrs. MacMahon's check in the amount of $3,000 payable to Grites is the check on which the charge against Grites was based.

John Palmer was leaving the bank as Mrs. MacMahon exchanged checks with Grites. When Grites saw Palmer, Grites left without cashing the check. Palmer and Mrs. MacMahon discussed this transaction and at that point Mrs. MacMahon became "concerned." On the following day, Saturday, the MacMahons decided to rescind the purchase of the cabin and determined that as soon as the Middleburg Bank opened on Monday morning, April 27, they would place a "stop payment order" on Mrs. MacMahon's check. This was done by Mrs. MacMahon shortly after 9:00 a.m. on April 27.

Meanwhile, John MacMahon, a carpenter, met with Grites on Saturday morning to assist Grites and his crew in the demolition of a building near the Winchester airport. This job was not completed at the request of the owner. John MacMahon, Grites and the crew then went to Middletown for the purpose of obtaining the cabin there. Because it was raining and the heavy equipment needed to load the logs would damage the yard, MacMahon and Grites decided to leave these logs until a subsequent day. MacMahon and Grites then proceeded to Fort Valley to load another cabin there. During the process of loading the logs for this cabin, one of the crew was seriously injured and the work was not com-

pleted. During these events John MacMahon reminded Grites not to cash Dr. MacMahon's check until the Middletown cabin was delivered. Grites did not mention that he had attempted to cash the check the previous evening or that Mrs. MacMahon had exchanged her check for it.

Later that Saturday afternoon when the totality of these events became known to the MacMahons, they decided to rescind their purchase of the cabin in Middletown. On three occasions over this weekend John MacMahon attempted to contact Grites by telephone to inform him the family no longer desired to purchase the cabin and that payment on the MacMahon's check was going to be stopped. At this time Grites lived in the home of Janie Alderson. A person named "Jim" also lived in this home. John MacMahon was not able to talk with Grites but left messages for Grites with Alderson and Jim to the foregoing effect.

On Monday morning, April 27, Grites and Alderson went to the First Virginia Bank in Strasburg (Strasburg Bank) shortly after the bank opened to deposit Mrs. MacMahon's check into Alderson's account there. Alderson was the sole signatory on this account. Grites and Alderson asked that Mrs. MacMahon's check be "processed immediately," and Grites paid for a phone call to the Middleburg Bank "to clear the check." Upon being advised by the Middleburg Bank that Mrs. MacMahon's check was good, the Strasburg Bank deposited the $3,000 to Alderson's account. This transaction was accomplished before the stop payment information had been processed by the Middleburg Bank.

On Tuesday, April 28, Alderson drew a check on her account payable to the Strasburg Bank in the amount of $2,600. A notation on this check indicated that this check was for "log house, Leo Bernstein, Middletown, paid in full." In return for this check, the Strasburg Bank issued a cashier's check in the same amount payable to Leo Bernstein.

On May 5, Mrs. MacMahon's check was returned to the Strasburg Bank with the notation that payment had been stopped by the Middleburg Bank. On May 9, the cashier's check payable to Leo Bernstein was returned by Alderson to the Strasburg Bank unnegotiated. When the cashier's check was returned to the Strasburg Bank unnegotiated, the Strasburg Bank was aware that payment had been stopped on the McMahon check. Despite that

knowledge, the Strasburg Bank gave Alderson a new cashier's check in the same amount ($2,600) payable to another person. The evidence contains no information concerning the new payee. Neither Grites nor Alderson reimbursed the Strasburg Bank for the original $3,000 and Alderson's account did not contain sufficient funds from which the Strasburg Bank could recover the $3,000.

On November 25, 1987, the grand jury returned an indictment charging Grites with obtaining money by false pretense from First Virginia Bank — Shenandoah Valley (Strasburg Bank) in violation of Code § 18.2-178.

Code § 18.2-178, in pertinent part, provides: "If any person obtain, by any false pretense . . . , from any person, with intent to defraud, money . . . , he shall be deemed guilty of larceny thereof." This statute requires the Commonwealth to prove beyond a reasonable doubt "an intent to defraud, an actual fraud, use of false pretenses for the purpose of perpetrating the fraud, and accomplishment of the fraud by means of the false pretenses used for that purpose." *Quidley v. Commonwealth*, 221 Va. 963, 965, 275 S.E.2d 622, 624 (1981). The fraud is accomplished by means of the false pretenses where the false pretenses to some degree induced the owner to part with his property. The false pretense must be a representation as to any existing fact or past event. Merely showing that the accused knowingly stated what was false is not sufficient; there also must be proof that his intent was to defraud and that the fraudulent intent existed at the time the false pretenses were made. The conduct or representation of the accused may be considered to determine whether the intent to defraud existed at the time the act was committed. *Riegert v. Commonwealth*, 218 Va. 511, 518-19, 237 S.E.2d 803, 807-08 (1977). With these general principles in mind, we address Grites' specific challenges to the sufficiency of the evidence.

Because he was indicted for obtaining money by false pretenses from the Strasburg Bank rather than from one of the MacMahons, Grites first argues that the evidence is not sufficient to support his conviction. He argues essentially that because Mrs. MacMahon's check was valid and backed by sufficient funds in her account when Grites presented this check to the Strasburg Bank, the bank was not defrauded. In addition, he argues that the Strasburg Bank could have "protected itself from loss" by assert-

ing its rights as "a holder in due course." In support of these arguments, Grites calls our attention to the Commonwealth's evidence that establishes that the Strasburg Bank verified the check with the Middleburg Bank before depositing it to Mrs. Alderson's account. In addition, Grites points out that when the Strasburg Bank learned that a stop payment had been placed on this check it could have prevented "most or perhaps all of the loss . . . by the simple expedient of charging the Alderson account with the $3,000 on May 5, 1988" rather than issuing a cashier's check to Alderson. We need not dwell on this unfounded argument. The simple fact established by the evidence is that the Strasburg Bank suffered a loss. In terms of Grites' criminal culpability under Code § 18.2-178, whether the Strasburg Bank could have prevented its loss or anyone's loss is immaterial. This statute does not shield one bent on criminal conduct by the quick response, astute business practices, or fortuitous circumstances of his intended victim.

■ Similarly, Grites also argues that even if he employed a false pretense the Commonwealth was limited to establishing that it related to the check drawn on Mrs. MacMahon's account. In this context he asserts that because Mrs. MacMahon's check was good when presented to the bank, his implied representation of that fact was true; thus, with regard to the Strasburg Bank, there was no false pretense. This argument also is without merit. "The victim of a fraudulent scheme need not be the person to whom the false pretense or misrepresentation is made." *Mosteller v. Commonwealth*, 222 Va. 143, 148, 279 S.E.2d 380, 382 (1981). Thus, the Commonwealth correctly asserts that if the evidence establishes that Grites intentionally committed an actual fraud by use of false pretenses and obtained money thereby, the fact that the ultimate victim was not the one against whom the false pretenses were used would be no defense.

■ Finally, Grites argues that the evidence is not sufficient to prove that he intended to defraud the Strasburg Bank or the MacMahons. It is clear that Leo Bernstein, not Grites, owned the log cabin in question. In offering to sell the cabin to the MacMahons, a fair inference can be drawn from the evidence that Grites knowingly made a false representation concerning this fact.

But merely showing that the accused knowingly stated what was false is not sufficient; there must also be proof that his

intent was to defraud.

* * *

[I]n order to determine whether the intent to defraud existed at the time the act was committed, the conduct and representations of the accused must be examined since intent is "a secret operation of the mind."

*Orr v. Commonwealth*, 229 Va. 298, 301, 329 S.E.2d 30, 32 (1985) (quoting *Riegert v. Commonwealth*, 218 Va. 511, 518-19, 237 S.E.2d 803, 808 (1977)(citations omitted)).

The fact that Grites did not own the log cabin, standing alone, does not establish an intent to defraud. *See Fay v. Commonwealth*, 69 Va. (28 Gratt.) 912 (1877). Under the reasoning of *Fay*, if a reasonable inference can be drawn from the evidence that Grites intended to obtain ownership of the log cabin and ultimately to convey that ownership to the MacMahons, the evidence is not sufficient to establish Grites' intent to defraud when he presented the check in question to the Strasburg Bank. Accordingly, we review the evidence of the conduct of Grites on this point.

Viewed in the light most favorable to the Commonwealth, much of Grites' conduct is consistent with an intent to defraud. His attempt to negotiate Dr. MacMahon's check in disregard of specific instructions not to do so before delivering the logs; his arranging to exchange this check for Mrs. MacMahon's check and then not cashing it when the first opportunity was available at the Middleburg Bank; his insistence that Mrs. MacMahon's check be processed immediately by the Strasburg Bank soon after it opened on Monday morning even though several messages had been left for him at his residence that the MacMahons no longer desired to purchase the logs; and the fact that he did not deliver the logs or reimburse the Strasburg Bank are all evidence tending to support an inference that "the secret operation of his mind" was one to defraud and obtain money for logs he did not own.

In contrast, however, the Commonwealth's evidence also established that Mrs. MacMahon knew that her check would be cashed the "very next morning" to pay the laborers who were to put the logs on a truck and bring them to her property. In fact, Grites and John MacMahon attempted to do this the very next day but did

not do so because it was raining and the heavy equipment would damage the owner's property. There is no direct evidence that Grites was told by Alderson or "Jim" prior to Monday morning when Mrs. MacMahon's check was deposited that the MacMahons no longer desired to purchase the logs or that a stop payment order had been placed on this check. Finally, the Commonwealth's evidence established that a cashier's check was secured from the proceeds of this check payable to Leo Bernstein, the owner of the logs. These facts are consistent with the hypothesis that Grites intended to secure the logs from the proceeds of Mrs. MacMahon's check and ultimately to deliver them as he had promised.

In short, the evidence supports the hypothesis that he intended to use the MacMahons' money to purchase the logs rather than to reimburse himself for the prior purchase of them. Such a scheme, while involving at least by inference false statements of existing facts, is not inconsistent with an intent ultimately to perform his contract with the MacMahons. Such a scheme is not inconsistent with a lack of intent to defraud. Moreover, "whether a criminal conviction is supported by evidence sufficient to prove guilt beyond a reasonable doubt is not a question of fact but one of law. A conviction based upon a mere suspicion of guilt or probability of guilt, however strong, cannot stand." *Bridgeman v. Commonwealth*, 3 Va. App. 523, 528, 351 S.E.2d 598, 601-02 (1986). Because the Commonwealth's evidence is consistent with Grites' innocence in that he lacked an intent to defraud, the Commonwealth's evidence as a matter of law is insufficient to establish his guilt beyond a reasonable doubt.

For these reasons, the conviction is reversed, the indictment dismissed and final judgment is entered in favor of Grites.

*Reversed and dismissed.*

Benton, J., and Duff, J., concurred.