**VERITA CORRINE CARMICHAEL, Appellant**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

**CARMICHAEL v. GOVERNMENT OF THE VIRGIN ISLANDS**

D.C. Crim. App. No. 2002/164

District Court of the Virgin Islands

Division of St. Croix

November 29, 2004

392

*For Appellant*: K. GLENDA CAMERON, ESQ., Law Offices of Lee J. Rohn, St. Croix, U.S.V.I.

*For Appellee*: MAUREEN PHELAN, AAG, St. Croix, U.S.V.I.

FINCH, *Chief Judge, District Court of the Virgin Islands*; MOORE, *Judge of the District Court of the Virgin Islands*; and KENDALL, *Judge of the Territorial Court, Sitting by Designation*

## MEMORANDUM OPINION

(November 29, 2004)

The appellant challenges her conviction below and asserts the following grounds for relief:

1) The court erred in denying her motion for judgment of acquittal based on a material variance in the Information and the evidence adduced at trial; and

2) The court erred in denying her motion for new trial on grounds evidence of payments she made in restitution to her employer should have been excluded as a compromise offer to settle a claim pursuant to Federal Rule of Evidence 408.

For the reasons which follow, we affirm the appellant's conviction.[1]

---

[1] Appellant raises several ancillary issues, which are discussed in the relevant sections below.

# I. STATEMENT OF FACTS

Verita Corrine Carmichael ["Carmichael," "appellant"] was charged and convicted in Territorial Court of 27 counts of obtaining money by false pretenses, in violation of title 14, section 834(2) of the Virgin Islands Code. [Appendix ("App.") at 7, 54-68]. She was additionally charged with one count of embezzlement; however, that count was dismissed by the government prior to the case being given to the jury. Those charges stemmed from charges that, while employed as an office manager and house-sitter for the Caribbean Allergy Center ["CAC"] and its owner, Dr. Larry Smith ["Dr. Smith"], she fraudulently cashed 27 of CAC's checks for her own benefit. [*Id.*].

Carmichael lived in Dr. Smith's residence for three weeks per month while he was away; she also worked as office manager at his business, CAC. [App. at 43]. Her duties as office manager involved making patients' appointments in Dr. Smith's absence, completing insurance forms, depositing insurance payments, and picking up mail. [App. at 126-27]. As office manager, Carmichael had access to the CAC's checkbook and a signature stamp of Dr. Smith, which were kept in a desk or filing cabinet in the office. [*Id.* at.126-29]. Dr. Smith's testimony was that Carmichael was authorized to use that stamp only for signing insurance forms in his absence, and that Carmichael had no authority to use it to sign checks. [App. at 44, 129, 149]. Dr. Smith also said he reserved no authority in Carmichael to write checks on his behalf; he did acknowledge, however, that on occasion when he was scheduled to leave the island and certain bills had not yet arrived, he would complete the check to the appropriate creditor and sign it, leaving only the amount to be filled in by Carmichael upon receipt of the bill. [*Id.* at 44, 127]. However, Carmichael asserted she was charged with taking care of expenses for the office and for Dr. Smith's home. That assertion was contradicted by evidence Dr. Smith personally paid for all expenses and purchased all necessary supplies for his home and office and did not leave that responsibility to Carmichael. [*Id.* at 44-45]. Cancelled checks from three of Dr. Smith's bank accounts were submitted to establish his sole authority for CAC's expenses and his home maintenance expenses. [*Id.*]. After apparently becoming concerned about the dwindling cash flow at CAC and Carmichael's failure to produce bank statements upon request for several months, Dr. Smith brought a worker from his Atlanta office, Betty Braswell ["Braswell"], to his CAC office to investigate.

Braswell discovered that ten pages—each containing three blank checks—had been removed from the back of CAC's checkbook. Braswell confronted Carmichael, who said the checks had been destroyed during Hurricane Lenny and discarded. [App. at 44]. After getting copies of the missing bank statements from the bank, Braswell learned that 27 checks missing from the checkbook had been endorsed with the signature stamp and cashed. [App. at 44, 129-30]. Braswell said that when she confronted Carmichael about the funds, which at the time was calculated at approximately $10,000—Carmichael admitted taking them to ward off creditors. [*Id.* at 45-46, 145-147]. She promised to repay the money and within one week repaid $8,000; she also promised to pay the remaining $2,000 and did so the following week. [*Id.* at 147-48]. However, in the interim, additional checks had been cashed and Braswell advised Carmichael the actual total due was $12,000. [*Id.* at 44, 149, 152-54]. The remaining $2,000 was never paid.

Carmichael was charged with 27 counts of obtaining money under false pretense; another charge for embezzlement was dismissed by the government during trial. At trial, Carmichael did not deny taking the.money but argued she had used it for purposes associated with maintaining Dr. Smith's home and office; Dr. Smith, however, disputed that and produced receipts showing that he paid all his own bills. [*Id.* at 44-45]. Carmichael also challenged admission of evidence of her restitutionary payments, arguing those payments were made as a settlement offer and were, therefore, inadmissible as evidence against her. Carmichael was convicted of all 27 counts. Her post-trial motions for new trial and judgment of acquittal were denied, and this timely appeal followed.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

■ This Court has appellate jurisdiction to review judgments and orders of the Territorial Court in all criminal cases in which the defendant has been convicted, with certain limitations where the conviction results from a plea of guilty. *See* V.I. CODE ANN. tit. 4, § 33 (1997).[2] We review the trial court's factual findings for clear error. *See*

---

[2] *See also* Revised Organic Act § 23A, 48 U.S.C. § 1613a. The complete Revised Organic Act of 1954 is found at 48 U.S.C. § 1541-1645 (1994), *reprinted in* V.I. CODE

*In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 193 (3d Cir. 2000). However, its application of legal precepts is entitled to plenary review. *See HOVIC v. Richardson*, 894 F. Supp. 211, 32 V.I. 336 (App. Div. 1995). Our review of the denial of a motion for judgment of acquittal based on a variance in the Information is plenary, and we determine "whether there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." *See United States Adams*, 759 F.2d 1099, 1109 (3d Cir. 1985). A motion for new trial may be granted if required in the interest of justice. *See* Terr. Ct. R. 135. We review a denial of a motion for new trial for abuse of discretion. *See Walker v. Government of V.I.*, 277 F. Supp. 2d 605, 608 (D.V.I. App. Div. 2003) (*citing Government of V.I. v. Sampson*, 94 F. Supp. 2d 639, 643, 42 V.I. 247 (App. Div. 2000)); *see also Affiliated Mfrs., Inc. v. Aluminum Co. of America*, 56 F.3d 521, 525-26 (3d Cir. 1995) (motion for new trial based on alleged error in the admission of evidence).

## B. Motion for Judgment of Acquittal

 Carmichael first argues the trial court erred in denying her motion for judgment of acquittal which was premised on an alleged material variance in the Information and the evidence adduced at trial. An Information is intended to provide an accused with notice of the charges against which he must defend. *See generally* FED. R. CRIM. P. 7; *United States v. Perez*, 280 F.3d 318, 345-46 (3d Cir. 2002). Once a case proceeds to trial, the prosecution is held to its proof of the crimes for which a defendant was given notice in the charging instrument and must adduce evidence sufficient to permit a reasonable jury to find guilt beyond a reasonable doubt as to those crimes. *See Perez*, 280 F.3d at 345; *see also Adams*, 759 F.2d at 1109; *Albrecht v. United States*, 273 U.S. 1, 8, 47 S. Ct. 250, 252, 71 L. Ed. 505, 509 (1927) (one may be convicted only of a crime for which he has been charged). An impermissible variance in the Information and the evidence at trial exists where it is shown: (1) that there was, in fact, a variance between the Information and the proof and (2) that the variance prejudiced some substantial right. *Adams*, 759 F.2d at 1109 (*citing Kotteakos v. United States*, 328 U.S. 750, 752, 756 [sic] 66 S. Ct. 1239, 90 L. Ed. 1557

ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 ·& Supp. 2003) (preceding V.I. CODE ANN. tit. 1) ["Revised Organic Act"].

(1946)); *see also United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 996) (same) (citations omitted). Such a variance occurs when "the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Balter*, 91 F.3d at 441 (citation omitted); *see also Perez*, 280 F.3d at 345-46. However, that does not end the inquiry. Rather, as noted in Baiter and its progeny, a variance does not warrant reversal unless it is also shown to have substantially prejudiced the defendant. Substantial prejudice is shown where the Information fails to "sufficiently inform [the defendant] of the charges against him so that he could prepare his defense and not be misled or surprised at trial" or where it potentially subjects him to double jeopardy. *Balter*, 91 F.3d at 441. (citations omitted).

## 1. Variance in Information

We begin first with Carmichael's assertion that the prosecution's evidence established only the crime of embezzlement rather than the crime of obtaining money under false pretenses as charged. The basis for Carmichael's argument is twofold: 1) that she came into rightful constructive possession of the checking account funds she was accused of taking, by virtue of having been entrusted with Dr. Smith's checkbook and the signature stamp used to endorse the challenged checks; and 2) that the bank, rather than Dr. Smith, was the real victim of any fraudulent representation under the charged statute and under local law limiting the circumstances under which such an institution could lawfully disburse funds upon presentment of a check. We discuss each of those arguments *seriatim.*

## a. Fraud versus entrustment?

The Information charged Carmichael with 27 counts of obtaining money by fake pretense, in violation of title 14, section 834(2) of the Virgin Islands Code, which makes it a crime to "knowingly and designedly, by false or fraudulent representation or pretenses, defraud[ ] any other person of money or property." V.I. CODE ANN. tit. 14, § 834(2). The linchpin of this offense is the use of fraud or trickery to obtain another's money or property. *See id.* This is unlike the crime of embezzlement, which requires proof of a fraudulent taking of property by one to whom it was entrusted by virtue of a position of trust. *See id.* at § 1087 (defining embezzlement as "the fraudulent appropriation of

397

property by a person' to whom it has been entrusted"). Entrustment is shown where an owner "deliver[ed] to another something in trust or ... commit[ted] something to another with a certain confidence regarding his care, use or disposal of it." BLACK'S LAW DICTIONARY 533 (6th ed. 1990); *compare* 14 V.I.C. § 1093 (noting offense of embezzlement made out where an employee has property of another which has come into his control or care by virtue of his employment); *see generally Moore v. United States*, 160 U.S. 268, 271, 40 L. Ed. 422, 16 S. Ct. 294, 295 (1895). Thus, to establish the offense of embezzlement, it must be shown as a threshold matter that the initial possession was lawful.[3] Carmichael's argument attacking the sufficiency of the evidence to establish she obtained the money through fraud is based largely on the erroneous premise that she was lawfully entrusted with those funds by virtue of her authority over CAC's signature stamp and checkbook. However, a review of the facts developed at trial belies this assertion.

█ The evidence developed at trial was that as office manager, Carmichael had access to a signature stamp which was kept in that office. Dr. Smith testified Carmichael was given access to the signature stamp only for the limited purpose of completing insurance forms in his absence. Carmichael was not given authority to use the stamp to sign checks and, indeed, that stamp was not used for that purpose in the regular course of CAC's business. Although Carmichael served as office manager and also house-sat at his home for three weeks each month, the evidence at trial established Dr. Smith wrote the checks for expenses for both the business and the home and did not charge Carmichael with that responsibility. Indeed, Carmichael's only authority with regard to CAC's checks was, on a few limited occasions, to complete the amount section on checks previously made out to CAC's creditors and signed by Dr. Smith. Dr. Smith explained that was done on limited occasions when the amounts of pending bills were unknown and were expected to arrive while he was off-island. Importantly, there was ample evidence that the checks from which the charges against Carmichael arose were not entrusted to her. Although the checks were in the office and accessible to Carmichael, the evidence at trial was that the checks used to

---

[3] Possession may be actual or constructive. "Constructive possession" denotes the "power to control and the intent to control" a thing not actually possessed, as "where one does not have physical custody or possession, but is in a position to exercise dominion or control over a thing." BLACK'S LAW DICTIONARY 314 (6th ed. 1990).

misappropriate CAC's funds were surreptitiously removed from the back of CAC's checkbook. When questioned about the missing checks, Carmichael said they were destroyed during Hurricane Lenny and discarded. Moreover, the evidence also supported a finding that Carmichael had no general check-writing authority. From these facts, we cannot conclude that Carmichael was entrusted with authority over CAC's funds or checking account. It would be a strain to do so. Rather, the evidence was sufficient to support a jury finding that Carmichael used her access to the checks held in that office to fraudulently obtain money belonging to CAC, as charged.

Courts facing similar challenges regarding the propriety of a conviction for obtaining money by false pretense in the context of an employment relationship and the distinctions between that offense and an embezzlement charge have declined to find lawful actual or constructive possession based on an employee's mere access to those funds or to the tools to facilitate easy access thereto. In *Government of V.I. v. Leonard*, 548 F.2d 478, 480 (3d Cir. 1977), the Third Circuit had occasion to decide the propriety of an embezzlement charge in the employment-employee context. There, an employee of a government agency who was given access to a storeroom containing chicken wire for limited purposes, entered the storeroom after hours and stole the employer's property contained therein. *Id.* at 480. The employee and the defendant in that case, who were both charged as aiders-abettors, were convicted under the embezzlement statute and challenged their conviction on grounds the element of entrustment was not met where the employee was provided with a key to the storeroom but had no authority whatsoever over the property therein. *Id.* The Third Circuit agreed, specifically rejecting the notion that "mere, access" to an employer's property, without a showing of specific authority or control over that property, is sufficient to establish lawful possession for the purpose of an embezzlement conviction:

> [The employee] obviously did not have the chicken wire in his possession, so the critical question is whether it was under his "control" by virtue of his trust. Mr. Penn testified that [the employee] was not authorized to place items in or remove them from the storeroom, or to exercise dominion over the contents of the storeroom in any way. [The employee] had been authorized, on at least one occasion, to enter the storeroom, but only for the

purpose of noting the contents, not for disposing of them in any fashion. He knew where the storeroom keys were located, but so did the secretaries and part-time volunteers, who also were not authorized to use the keys without permission. Such knowledge scarcely amount to "control" over the contents of the storeroom. Moreover, [the employee] came like a thief in the night, entered the storeroom in the same manner as anyone who had accidentally discovered the location of the keys, and removed the wire rolls.

These facts convince us that the elements of embezzlement were not made out. Mere access to the storeroom was not sufficient to invest "control" in [the employee].

*Leonard*, 548 F.2d at 480. Rather, the Court likened the employee's crime to that of a janitor who, "entrusted with the key to an office, ... takes an item left lying on a desk." *Id.*

On analogous facts to those here, the Fifth Circuit Court of Appeals in *United States v. Sayklay*, 542 F.2d 942, 943 (5th Cir. 1976) similarly declined to equate access to an employer's funds with the entrustment of those funds. There, the defendant, a bookkeeper at the bank, used her access to the bank's check-encoding machine, customer's account numbers, and blank checks to create checks which she signed with her own name and cashed through a teller. *Id.* To conceal her crime, the defendant then destroyed the cashed checks when they arrived at the bookkeeping department. *Id.* The bookkeeper's conviction for embezzlement was overturned, the court having expressly rejected the prosecution's reasoning that the defendant, as a bank employee with no authority over the bank's funds, was entrusted with all the <u>tools</u> needed to acquire the funds held in the other employees' accounts and, by virtue of such access "constructively possessed the funds in a manner sufficient to meet the possession element of embezzlement." *Id.* at 944 (noting the defendant was more properly charged under a willful misappropriation statute).[4]

---

[4] *Compare, Skantze v. United States*, 110 U.S. App. D.C. 14, 288 F.2d 416, 417 (1961) (affirming conviction of false pretenses where embassy cashier charged with maintaining cash funds to pay for business-related expenses and keeping records converted such funds to personal use by fraudulently obtaining signature on checks from superiors); *State v Lomax*, 322 Mo. 86, 14 S.W.2d 436 (1929) (entrustment found to support embezzlement conviction where accused had authority to write checks as treasurer of a school district and president of the bank in which the funds of the school

Here, as in *Sayklay* and *Leonard*, and in line with the distinctions noted above, the evidence at trial supported a finding that Carmichael was not entrusted with authority over the funds which were taken but, rather, merely used her knowledge of and access to the checks held in the office to facilitate her fraud. This Court is unpersuaded that *United States v. Weller*, 238 F.3d 1215, 1219 (10th Cir. 2001) or *United States v. Whitlock*, 214 U.S. App. D.C. 151, 663 F.2d 1094, 1107 (D.C. Cir. 1980), on which appellant relies, compels a different result. In Weller, a bank branch manager, with direct authority and control over the bank's funds in the course of her employment, entered the bank's vault and took funds for her personal use. *See Weller*, 238 F.3d at 1219. The bank manager unsuccessfully challenged her conviction for embezzlement, arguing that because she had entered the bank after hours and had no authority to be there at that time, the funds taken were not lawfully in her possession and control. The court affirmed her conviction, having determined that as the branch manager, the defendant was entrusted with both access to and control of the bank's money. *Id.* Similarly, in *Whitlock*, the court held the banks' funds were effectively in the control of the defendant, who held a management position and who was given special access to the funds in the bank's vault as a result. *See Whitlock*, 663 F.2d at 1112. In both cases, the defendants' authority and control over the taken property, as bank managers with direct dominion over the employer's money, was well-established. Therefore, *Weller* and *Whitlock* are consistent with the distinctions determinative of a proper charge for embezzlement noted above: that is, the presence of authority *and* control over the taken property. Those elements were notably absent in this case.

Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the Government as verdict winner, this Court affirms the trial court's denial of the motion for judgment as a matter of law, as the evidence at trial amply supported a conviction for the crimes charged.

---

district were deposited and where such funds were misappropriated under the color of such authority); *State v Lockie*, 43 Idaho 580, 253 P. 618 (1927) (bookkeeper with authority to draw checks for the purchase of office supplies, was properly found guilty of embezzlement when he drew checks payable to cash on the company's account); *Simmons v. State*, 165 Miss. 732, 141 So. 288 (1932) (treasurer of association drew a check for personal benefit).

### b. Who was rightful victim of the fraud?

Carmichael additionally argues the evidence was at odds with the Information and insufficient in its failure to establish that anyone but the bank was the victim of any fraudulent representations. In short, she contends first.that the fraud necessary to establish the offense was perpetrated on the bank and not on CAC. Secondly, she contends that under the provision of the Uniform Commercial Code (as adopted in the Virgin Islands) governing when a bank may debit a customer's account for wrongfully honored or fraudulent checks, *see* 11A V.I.C. § 4-406, it was the bank—and not CAC—that was defrauded of its money.

■ Carmichael's argument that the fraud was directed at the bank, and not CAC, is inconsistent with the overwhelming authorities establishing that proof of that offense does not require a showing that the fraudulent representations were made to the ultimate victim. The plain language of the statute under which Carmichael was charged makes it an offense to: 1) knowingly and designedly, 2) by false or fraudulent representation or pretenses, 3) defraud any other person of money or property. *See* 14 V.I.C. § 834. The statute expressly makes it a crime to defraud "any person" of money and does not condition criminal liability on proof that the ultimate victim who suffers loss as a result of the defendant's conduct was also the person to whom the fraudulent representation was made or who detrimentally relied on the fraud. Indeed, that seems an absurd result which would insulate a defendant from criminal liability for conduct used to obtain a benefit at another's expense, so long as the fraud is committed through a person other than the victim. *See e.g., State v. McDonald*, 534 S.W.2d 650, 652 (Tenn. 1976) ("It is obvious that there must be reliance by someone, but in this modern day and age when fraud and deceit are practiced with sophistication and ingenuity a narrow construction such as this would be tantamount to a judicial conference of the proverbial license to steal.") (internal quotation marks omitted). Such a construction would also appear contrary to the companion provision of section 831, which defines what is required to establish the element of intent to defraud: "Whenever, by any provisions of this code, an intent to defraud is necessary to constitute a crime, <u>it is sufficient if any intent appears to defraud any person</u>, as such term is defined in section 41 of title 1, or any body politic." *Id.* at § 831 (emphasis added). Similarly, commentators and courts in other jurisdictions faced with this issue have determined that the modern view is to require only a showing that there

402

was a fraudulent representation to *any person*, made for the actor's gain and intended to harm the ultimate victim. *See e.g.*, 35 C.J.S. *False Pretense* § 29.[5] In view of the express statutory language which does not condition criminal liability on proof that the representations were made to the victim ultimately defrauded of money or property, and in the absence of any other indication the legislature intended a contrary view, this Court will also avoid reading that element into the statute.

Carmichael's related argument that under the 11A V.I.C. § 4-406 the defrauded victim in this case was the bank, and not CAC, must also be rejected. For this argument, Carmichael argues that under the provisions of section 4-406 governing which party bears the loss in the event a check bearing an unauthorized drawer's signature is honored, it was the bank's money which was fraudulently taken, as the bank could not properly debit CAC's account for any fraudulent checks which it improperly honored. Thus, Carmichael argues the victim of the fraud was, as a matter of law, the bank and not CAC. This argument is misguided and need not detain us here, in light of the undisputed evidence at trial that CAC's account was, in fact, debited and that it suffered loss as a result of Carmichael's conduct.[6] Moreover, even if we

---

[5] *See e.g., McDonald*, 524 S.W.2d at 652; *Grites v. Commonwealth*, 9 Va. App. 51, 384 S.E.2d 328, 331-32, 6 Va. Law Rep. 214 (1989); *State v. Melvin*, 392 S.E.2d 740,746 (N.C. App. 1990).

[6] The U.C.C. is a statute which governs the relationship between the bank and its customers. *See* 11A § 4-101 comment 3. In that regard, section 4-406 outlines the responsibilities of a customer to prevent losses and the circumstances under which the bank may be held to absorb losses resulting from honoring a fraudulent check. That section imposes upon a customer the responsibility to examine bank statements and to report an authorized signature or alteration within a reasonable time. *See* § 4-406(c), (f). Where the customer fails to timely report unauthorized signatures, he or she may then be precluded from asserting a claim against the bank if the bank suffered loss as a result or if the bank paid an item in good faith to the same wrongdoer. *See* 11A V.I.C. § 4-406(d). The bank may be forced to share in the losses from fraudulent checks under certain circumstances where it was negligent in paying the item. *Id.* § 4-406(e). The above-noted provisions clearly condition the bank's liability to bear the loss from fraudulent checks on the customer's diligence in promptly reporting an unauthorized signature. *Id.; compare* § 4-401 (bank authorized to charge customer's account only for items "properly payable," which does not include items containing a forged drawer's signature). The bank may not debit its customer's account based on a forged signature, unless the customer is precluded under the statute from denying the signature as a result of his/her own negligence in either contributing to the forgery or in failing to seasonably report it. The bank's good faith in paying an item or the customer's negligence contributing to the forgery are factors considered in assessing the parties' relative responsibility. *See* § 4-

accepted as merited Carmichael's argument that the bank was negligent in debiting CAC's account, Carmichael has failed to assert that she would have standing under any discernible circumstance to assert the rights of CAC under section 4-406 or related provisions.[7] Having found no variance in the Information and the proof, we need not discuss the prejudice prong. The trial court's denial of appellant's motion for judgment of acquittal will be affirmed.

## C. Motion for New Trial

Carmichael additionally claims error in the trial court's admission of evidence she made restitution to CAC prior to the imposition of criminal charges, which she claims violated her right to a fair trial. In support of this argument, Carmichael asserts that $10,000 she made in restitution to

---

406, 3-406(a) and comment 3, illustration 1 (customer/employer leaving signature stamp and checks to thief's access may constitute negligence contributing to forgery by use of that stamp, which precludes claim against the bank for payment on unauthorized signature). Thus, contrary to appellant's assertion, the statute does not, as a matter of law, impose the burden of loss on the bank where an unauthorized signature is honored; rather, that determination is made after balancing the respective negligence and conduct of each party.

The authorities relied upon by the appellant are distinguishable on their facts. *See e.g.*, *Gardner v. Commonwealth*, 262 Va. 18, 546 S.E.2d 686, 686-89 (2001) (holding there was material variance where Information charged that grandfather was victim of the false pretense, because bank never debited grandfather's account but instead absorbed the loss after noticing the forgery; noting this fact distinguished the case from other cases where the customers were properly noted as the victim because their accounts were, indeed, debited); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 759 and n.15 (3d Cir. 1990) (discussing drawee bank's preclusion from debiting account based on forged indorsement and its recourse in recouping losses from prior collecting or depositary banks based on warranty of title; noting analysis different where check contains forged drawer's signature rather than forged endorsement); *Perini Corp. v. First Nat. Bank of Habersham County*, 553 F.2d 398, 404 (5th Cir. 1977) (discussing allocation of loss based on each party's negligence); *Cumis Ins. Soc, Inc. v. Girard Bank*, 522 F. Supp. 414, 420 (D.C. Pa. 1981) (similarly noting that, under Pennsylvania law, a bank may not debit account based on forged signature, unless it is shown that customer's negligence contributed to the forgery).

[7] *Compare*, 11A § 4-101 comment 3, § 4-103 (noting that U.C.C. governs the relationship between the bank and its customers and may, in some instances, be altered by contract); *cf.* 88 A.L.R.2d 688 (1963); *Grites*, 384 S.E.2d at 331-32 (rejecting argument that bank could have prevented its losses or losses to its customer by taking certain actions to foil the fraudulent scheme, noting that defendant's criminal culpability is not shielded by "the quick response, astute business practices, or fortuitous circumstances of his intended victim.").

CAC was made as an offer of compromise under Federal Rule of Evidence 408 and was, therefore, improperly admitted as evidence at trial. The Government counters, and the trial court held, that ·Carmichael's repayment was not a compromise settlement under Rule 408 and, alternatively, fell within the exceptions to that rule-which do not protect efforts to obstruct a criminal prosecution.[8] The trial court additionally found that the probative value of the evidence outweighed the potential for unfair prejudice under Rule 403.

 Rule 408 limits the admission of evidence intended to settle disputes as follows:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or providing an effort to obstruct a criminal investigation or prosecution.

FED. R. EVID. 408. To be applicable, it must be shown that there was: 1) an offer by the defendant; 2) acceptance by the plaintiff; 3) and valuable consideration; 4) in compromise of a disputed claim. The policies underlying Rule 408 favor encouraging out-of-court settlement of disputes by affording assurance that a party will not be later prejudiced by such efforts if the case nonetheless proceeds to trial. FED. R. EVID. 408 advisory committee notes; *see also Affiliated Mfrs., Inc. v. Aluminum Co. of America*, 56 F.3d 521, 526 (3d Cir. 1995) (noting policy to encourage freedom of discussion in civil disputes). This policy is in recognition of the various reasons that motivate parties to settle

---

[8] The trial court assumed, without deciding, that Rule 408 applies to criminal cases, and the parties do not challenge that application. We need not resolve here whether Rule 408 generally applies in criminal cases, as Carmichael cannot satisfy the requirements of the rule and is not entitled to the protections of the rule in any event.

disputes, short of admitting liability and apart from the merits of the case, such as a desire to avoid the cost and harassment of litigation. *See* FED. R. EVID. 408 advisory committee notes. Key to the applicability of this rule is the existence of a dispute regarding the validity or amount of the claim and some form of compromise as to that dispute. *See id.* While commencement of litigation is not necessary to bring such an offer of compromise within the rule, there must nonetheless be shown to be an actual dispute or a difference of opinion regarding the validity or amount of the claim at the time the offer was made. *See Affiliated*, 56 F.3d at 527 (3d Cir. 1998) (rejecting "crystallization" test adopted in *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir. 1977) and other jurisdictions, which required filing of complaint for rule to apply). Because a dispute as to the amount and validity of the claim is a foundational requirement for Rule 408's application, payment of the full amount demanded or acknowledgment of the debt has been held not to constitute a compromise offer and is not protected under Rule 408. *See* FED. R. EVID. 408 advisory committee notes (noting that "effort to induce a creditor to settle an admittedly due amount for a lesser sum" is not protected by the rule); see also CHARLES ALAN WRIGHT AND KENNETH R. GRAHAM, 23 FEDERAL PRACTICE AND PROCEDURE § 5303, 181-82 (1980). Such undisputed debts are viewed as contrary to the idea of a compromise or negotiations and do not further the policy of settling disputes. *See id.; see also* WRIGHT AND GRAHAM, § 5306, 212.

The policy disfavoring protection from acknowledged or undisputed debts under the rule is also furthered in the requirement that compromise offers be supported by valuable consideration. "Consideration" requires a performance or a return promise that has been bargained for. RESTATEMENT (SECOND) OF CONTRACTS § 71 (1981). A promise is bargained for under the definition noted above where "the consideration and the promise bear a reciprocal relation of motive or inducement: the consideration induces the making of the promise and the promise induces the furnishing of the consideration." *Id.* at comment b. However, performance of a preexisting legal duty "which is neither doubtful nor the subject of honest dispute is not consideration." *Id.* § 73. A promise to settle or pay in full a debt that is undisputedly owed comes within the preexisting duty rule and will not constitute consideration. The restatement explains by illustration:

A promises to pay a debt to B, or to perform an existing contractual duty to B, or to perform his duty as a public official. The legal duty is neither doubtful nor the subject of honest dispute, but A would not have fulfilled the duty but for B's return promise. A's promise is not consideration for B's return promise.

*Id.* § 75 comment c, illus. 1; *compare* § 74 (settlement of honestly disputed debts); *cf.* RESTATEMENT (FIRST) OF RESTITUTION § 128 (1937) (noting one who steals or converts another's property to his own use is under a legal duty to make restitution).

We find ample support in the record for the trial court's determination that there existed no dispute regarding the amount or validity of the debt at the time Carmichael agreed to repay CAC. Given the requirements of the rule noted above and the evidence at trial that when initially confronted by her employer regarding the missing funds Carmichael readily admitted taking the money to pay her creditors and agreed to repay the full amount demanded, the trial court did not abuse its discretion in determining that Carmichael's conduct did not come within Rule 408. Carmichael's attempt to bring her restitution payment within the rule must also fail for lack of consideration because, having taken CAC's funds for her own use, any agreement to repay those funds, which she already had a duty to do, cannot constitute valuable consideration under Rule 408. Therefore, the trial court did not abuse its discretion in admitting evidence of those payments.

The court also did not abuse its discretion in admitting the evidence under Rule 403, where evidence of Carmichael's repayment was probative of the material issues of the case and would be generally admissible as an admission against interest.[9] *See e.g., United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986) (noting presumption favoring admissibility of relevant evidence); *see also* FED. R. EVID. 801(d)(2)(A) and advisory committee notes (noting statements against interest are the product of the adversary system and contribute to finding of the truth); *see United States v. Hooper*, 596 F.2d 219, 225-26 (7th Cir. 1979).

---

[9] Relevant evidence may be excluded where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentations of cumulative evidence." FED. R. EVID. 403.

## III. CONCLUSION

In view of the foregoing, the trial court's denial of appellant's motion for judgment of acquittal and new trial will be affirmed. An appropriate order follows.