

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-21-2006

# USA v. Flores

Precedential or Non-Precedential: Precedential

Docket No. 05-1271

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Flores" (2006). *2006 Decisions.* Paper 650.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/650

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-1271

_____

UNITED STATES OF AMERICA

v.

LUIS A. FLORES,

Appellant

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 04-cr-00021-1)
District Judge: Honorable Ann E. Thompson

_____

Argued March 7, 2006

Before: RENDELL and AMBRO, <u>Circuit Judges</u>,
SHAPIRO,[*] <u>District Judge</u>

_____

[*]Honorable Norma L. Shapiro, Senior District Judge for
the Eastern District of Pennsylvania, sitting by designation.

(Opinion filed: July 21, 2006)

Mark A. Berman, Esquire (Argued)
Claudia Van Wyk, Esquire
Gibbons, Del Deo, Dolan, Griffinger & Vechione
One Riverfront Plaza
Newark, NJ   07102-5497

      Counsel for Appellant

Christopher J. Christie
  United States Attorney
George S. Leone
   Chief, Appeals Division
Caroline A. Sadlowski (Argued)
   Assistant U.S. Attorney
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ   07102

Norman J. Gross, Esquire
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, NJ    08101

      Counsel for Appellee

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

Luis Flores was convicted by a jury of one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956, three counts of money laundering in violation of 18 U.S.C. § 1957, and one count of conspiracy to structure currency transactions in violation of 18 U.S.C. § 371. The United States District Court for the District of New Jersey sentenced Flores to a 32-month term of imprisonment. He timely appeals and, for the reasons provided below, we affirm.[1]

## I.     Factual and Procedural Background

Flores is an attorney who, after graduating from Fordham Law School, opened his own solo practice in the Queens Borough of New York City. In 1998, he was visited in his office by German Osvaldo Altamirano-Lean ("Altamirano"). Altamirano presented himself as an Ecuadorian businessman

---

[1]This appeal is from the judgment in a criminal case imposed by the United States District Court for the District of New Jersey. The District Court had jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction pursuant to 28 U.S.C. § 1291.

eager to establish his flower, fruit, and seafood import/export business in the United States. According to Flores, a naturalized American citizen and native of Chile, he was persuaded that Altamirano was who he purported to be. Flores had recently finished work on a matter for the Republic of Argentina, and was interested in developing a practice assisting South American businessmen.

Over the next several years, Flores opened several corporations for Altamirano, ultimately naming himself as the nominal president of those companies. He also established several business checking accounts for each of the corporations at different banks, signed myriad blank checks drawn on those accounts, and authorized numerous wire-transfers from the accounts to various foreign and domestic recipients. Ultimately, Altamirano, Flores and others were indicted for conspiracy to commit money laundering and other offenses. Altamirano cooperated with the Government and testified at Flores' trial. The Government's theory of the case was that Flores was "willfully blind" to Altamirano's unlawful activities. The defense, on the other hand, argued that Altamirano had deceived Flores into believing that he was a legitimate businessman and that Flores was Altamirano's unknowing victim and not his co-conspirator.

The following evidence was presented at trial. Flores assisted Altamirano in incorporating nine companies between December 1998 and June 1999, and opening bank accounts on

4

behalf of those corporations. In January 1999, Flores attempted to obtain tax identification numbers for three corporations using first one and then another social security number provided by Altamirano, but in each instance Flores was informed that the numbers were false. He warned Altamirano about the unlawfulness of using invalid social security numbers, and offered to take steps to obtain valid numbers. Instead, Altimirano removed the corporate books from Flores and gave them to co-conspirator Victoria Hernandez. Altamirano paid Hernandez $2,000 per week to open corporations and manage his relationships with the banks. In April 1999, Altamirano learned that Hernandez had been stealing from him. Altamirano thus decided to return the books to Flores, who agreed to open and oversee bank accounts for the corporations in exchange for the $2,000 weekly salary that Hernandez had received. Flores was paid the $2,000 each week in cash.

In early May 1999, Flores arranged for the incorporation of three new companies and opened an account for each of them at four banks: Republic National Bank, European American Bank, Chase Manhattan Bank, and Citibank. As noted previously, Flores held himself out as the president of these corporations, and was the only person authorized to sign checks, transfer money, and act on behalf of the entities. For each checkbook, Flores signed about 25 to 30 blank checks; Altamirano retained two or three of these checks to make transfers from one account to another, and sent the remaining checks to Columbia. As soon as the accounts were opened,

5

multiple cash deposits were made and money began to be wired in and out of the accounts and between accounts. Individual deposits were always less than $10,000, but on any given day the aggregate amount deposited in any account could exceed $10,000.

Just weeks after he had opened the new accounts, Flores received a letter from Republic National Bank (1) explaining what "structured" transactions are and why they are illegal, and (2) informing him that "when an account receives a large incoming wire [transfer of money] and immediately sends an outgoing wire or wires for approximately the same amount, without apparent commercial justification, it mirrors the activity of an account opened by money launderers." Flores and Altamirano were asked to attend an in-person meeting at Republic National Bank in late May 1999, at which they were expected to supply documentation of the source of the funds in the bank accounts. When they failed to do so, a bank employee requested they speak with the bank manager, Thomas Grippa. In response to Grippa's questions concerning the number of accounts and seemingly "structured" cash transactions, Altamirano stated that he maintained multiple accounts to create the appearance for his Ecuadorian suppliers that he had many profitable businesses and to get certain credits from the government of Ecuador. He also explained that he was paid in cash by a customer at the Hunts Point produce market and that he had lost a lot of money after a hurricane delayed his ship and a large shipment of food spoiled. Grippa testified that he did

6

not accept any of these excuses. Ultimately, both Republic National Bank and European American Bank closed the accounts. Flores told Altamirano that he felt more comfortable working with Citibank and Chase, where he had personal contacts.

Flores' accountant, Israel Rivera, who was hired to perform work for Altamirano in April 1999 due to the increasing difficulty of balancing Altamirano's books, testified that he asked Flores for copies of invoices to document the source of funds in the accounts. He also reported that he had voiced concern to Flores about large payments to European companies that bore no apparent relationship to the import/export of fruit, flowers, and fish from Ecuador. According to Rivera, he received neither an explanation nor copies of invoices in response to his requests.

Flores remained the sole signor and receiver of the companies' multiple account statements for several additional months, during which approximately $1,288,085 passed through the companies' remaining bank accounts. It is undisputed that the cash was transferred via checks and wire transfers signed by Flores to recipients in Columbian-operated brokerage houses on the Black Market Peso Exchange. As a result of these activities, the Government charged Flores with conspiracy to launder money, money laundering, and conspiracy to structure currency transactions. A jury convicted Flores on all counts. Before the jury was discharged, the parties entered

7

into a stipulation limiting the issues presented for the District Court's determination at sentencing. Moreover, Flores filed a motion for acquittal and/or a new trial, which was denied. In January 2005 the District Court sentenced Flores to a 32-month term of imprisonment. This appeal followed.

## II. Merits

### A. Was the evidence produced by the Government at trial sufficient to prove that Flores was willfully blind to the money laundering scheme?

We review the grant or denial of a motion for judgment of acquittal *de novo*, applying the same standard as the District Court. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). We must "sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." *United States v. Gambone*, 314 F.3d 163, 169-70 (3d Cir. 2003). As we have made clear, a court "must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Brodie*, 403 F.3d at 133; *see also United States v. Jannotti*, 673 F.2d 578, 581 (3d Cir. 1982) (*en banc*) (trial court usurped jury function by deciding contested issues of fact).

Flores argues that the Government failed to prove

8

beyond a reasonable doubt that he knew or was willfully blind to the fact that the money laundered by Altamirano either "represent[ed] the proceeds of some form of illegal activity," 18 U.S.C. § 1956(a)(1), or was "criminally derived property," 18 U.S.C. § 1957(a). According to Flores, "[t]he only form of unlawful activity identified at trial was drug trafficking. Yet the evidence the Government presented was wholly insufficient to establish [his] knowledge of, or willful blindness to, the fact that the funds originated in drug trafficking or any other crime."

To prove conspiracy to commit money laundering, the Government was required to show, *inter alia*, that Flores consorted with others in a money laundering scheme,

> knowing that the property involved in a financial transaction represent[ed] the proceeds of some form of unlawful activity [and] conduct[ed] or attempt[ed] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(1). It is undisputed that the financial transactions Flores conducted on behalf of Altamirano "in fact involve[d] the proceeds of specified unlawful activity," to wit, narcotics trafficking. Thus, the only question is whether the Government produced evidence that Flores *knew* of or was willfully blind to the fact that the funds originated in *some form of unlawful activity*, sufficient to obtain a conviction under §

9

1956(h). *See* 18 U.S.C. § 1956(c)(1) (stating that it is sufficient if "the person knew the property involved in the transaction represented proceeds from some form, *though not necessarily which form*, of activity that constitutes a felony under State, Federal, or foreign law") (emphasis added). Accordingly, the defense's argument that the Government needed to prove that Flores knew of, or was willfully blind to, the fact that the funds originated in drug trafficking is off point.

To prove money laundering, the Government was required to show that Flores,

> knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

18 U.S.C. § 1957(a). Again, because the monetary transactions that Flores conducted on behalf of Altamirano were "derived from specified unlawful activity," the only question is whether the Government produced sufficient evidence that Flores *knew* that the monetary transactions represented the proceeds of *criminally derived property*. For the same reasons provided above, the defense's argument—that the Government needed to prove that Flores knew of, or was willfully blind to, the fact that the funds originated in drug trafficking to obtain a money laundering conviction—fails. *See* 18 U.S.C. § 1957(c) ("[T]he Government is not required to prove that the defendant knew

10

that the offense from which the criminally derived property was derived was specified unlawful activity.").

Our remaining task is to determine whether there is substantial evidence in the record, viewed in the light most favorable to the Government, that Flores knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity and/or criminally derived property. Knowledge may be demonstrated by showing that a defendant either had actual knowledge or "deliberately closed his eyes to what otherwise would have been obvious to him concerning the fact in question." *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999). The Government establishes willful blindness by proving that a defendant "was objectively aware of the high probability of the fact in question," *Brodie*, 403 F.3d at 148 (citation omitted), and "could have recognized the likelihood of [illicit acts] yet deliberately avoided learning the true facts." *Stewart*, 185 F.3d at 126.

Here, the jury reasonably concluded that Flores participated in the money laundering conspiracy either knowingly or with willful blindness. The following record evidence, *inter alia*, created in Flores objective awareness of the high probability that Altamirano was involved in money laundering: (1) one of Flores' initial interactions with Altamirano involved the supply of two false social security numbers; (2) as soon as Flores opened multiple bank accounts for the corporations, large amounts of cash began flowing in

11

and out of the accounts, despite the fact that the corporations had just opened for business and had no physical location other than Flores' own offices; (3) Flores received a letter from the Republic National Bank explaining what "structured" transactions are and why they are illegal, and informing him that "when an account receives a large incoming wire and immediately sends an outgoing wire or wires for approximately the same amount, without apparent commercial justification, it mirrors the activity of an account opened by money launderers"; (4) the manager of Republic National Bank disbelieved Altamirano's explanation concerning his numerous accounts and financial transactions and told Altamirano and Flores that the accounts were "evidently" being used for "money laundering"; (5) Flores' accountant, Rivera, testified that he had sought invoices documenting the source of the funds but never received the documentation he requested; and (6) Rivera also questioned Flores about why the funds were being sent to foreign companies with no apparent relationship to the Ecuadorian fruit, fish or flower trade.

In response to the substantial evidence that Altamirano was involved in some sort of illegal activity, Flores willfully blinded himself to the truth. He never requested any proof of the legitimacy of the transactions from Altamirano or even any further explanation addressing either the bank manager's or accountant's concerns. That Flores "did not ask the natural follow-up question[s] to determine the source of those funds could reasonably be considered by a jury to be evidence of

12

willful blindness." *United States v. Wert-Ruiz*, 228 F.3d 250, 257 (3d Cir. 2000). Indeed, when faced with the above-detailed evidence, instead of making obvious inquiries, Flores engaged in additional money laundering transactions. For example, he continued to sign checks and wire transfers and to receive account statements documenting the flow of over $1,200,000 through the accounts. Moreover, Flores dissuaded Altamirano from discontinuing suspicious financial transactions after the meeting with Republic National, and instead opened accounts at other banks, stating that he needed the $2,000 per week he was being paid in cash to oversee the bank accounts. Thus, the jury could have inferred that Flores was motivated to avoid learning the truth because the money laundering operation was profitable to him. *See Brodie*, 403 F.3d at 158.

In sum, the jury's verdict reflects that it reasonably concluded, based on the evidence before it, that Flores was willfully blind to the illegal source and disposition of the funds in the accounts of the corporations he formed. "This is not to say that [Flores] did not proffer alternative explanations, but the verdict indicates that the jury did not credit them. Because [substantial] evidence supports that verdict, we [should] not second guess that decision." *Wert-Ruiz*, 228 F.3d at 258.

### B. Did the District Court properly instruct the jury on the law of willful blindness?

We generally exercise plenary review in determinating

13

"whether the jury instructions stated the proper legal standard," and review the refusal to give a particular instruction or the wording of instructions for abuse of discretion. *United States v. Khorozian*, 333 F.3d 498, 507-08 (3d Cir. 2001) (internal quotation omitted).  Here, however, Flores failed to raise his objection to the willful blindness instruction at trial.  As a result, his claim can be reviewed only for plain error.  *See* Fed. R. Crim. P. 30 (providing that "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection"); *Gov't of the Virgin Islands v. Knight*, 989 F.2d 619, 631 (3d Cir. 1993) (without a "clearly articulated objection," "a trial judge is not appraised sufficiently of the contested issue and the need to cure a potential error to avoid a new trial").

Under the plain error standard, before an appellate court can correct an error not raised at trial, it must find: (1) an error; (2) that is plain; and (3) that affected substantial rights.  *United States v. Olano*, 507 U.S. 725, 733-35 (1993); *United States v. Davis*, 407 F.3d 162, 164 (3d Cir. 2005) (*en banc*); *United States v. Syme*, 276 F.3d 131, 143 n.4 (3d Cir. 2002).  If all three conditions are met, we may in our discretion grant relief, but only if "'the error seriously affects the fairness, integrity, or public reputation of [the] judicial proceedings.'" *United States v. Haywood*, 363 F.3d 200, 206-07 (3d Cir. 2004) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

14

Flores argues that the District Court's willful blindness instruction erroneously (1) failed to require a jury finding that he was willfully blind to the specific money laundering and structuring activity charged in the indictment, as opposed to some other uncharged or unspecified "illegal activity" (or "something amiss"), and (2) shifted the burden to him of proving that he "actually believed" that Altamirano was not engaged in any money laundering or structuring activity when, as a matter of due process, it was the Government's burden to disprove that contingency beyond a reasonable doubt. In response, the Government submits that the language stating that Flores needed to know that "illegal activity was going on," or that "something was amiss," is standard language of a willful blindness charge and, in any event, "there was no other illegal activity in which Flores was accused of participating" besides money laundering and structuring currency transactions. The Government further maintains that the fact that the District Court substituted "*if the defendant shows*" for "*if the evidence shows*" in its oral charge did not affect the jury's deliberations because the written jury instruction, read by the jurors and used by them in their deliberations, includes the correct language and the instruction made clear, both in general and with respect to willful blindness, that the Government bore the burden of proof.

The Government's arguments are persuasive. "Jury instructions must be read as a whole," and the jury in this case was specifically charged to do just that. *E.E.O.C. v. Del. Dept. of Health and Soc. Servs.*, 865 F.2d 1408, 1418 (3d Cir. 1989).

15

It is uncontested that the jury was properly charged as to all of the essential elements of the money laundering and currency structuring counts. Those counts required the jury to find beyond a reasonable doubt the elements that the defendant "knowingly" committed or conspired to commit money laundering and currency structuring. Moreover, the District Court repeatedly and expressly referred to money laundering and money structuring within the willful blindness instruction. Considered with the totality of the relevant instructions, the Court's instruction only permitted a finding of Flores' guilty knowledge if that finding was based on his willful blindness that he was engaged in money laundering and structuring, and not some other illegal activity. The instruction also makes clear that the only purpose of applying willful blindness to a fact is if the Government had a "burden of proving the element of knowledge of that fact."[2]

---

[2]The Court of Appeals for the Eleventh Circuit rejected a similar claim to the one presented here, also raised in the context of a prosecution for money laundering based on a violation of 18 U.S.C. § 1956. The Court there explained that, given the instructions as a whole, particularly the court's instructions on the elements of the crime, the fact that the court did not define the "specified unlawful activity" in the willful blindness instruction did not constitute plain error. *United States v. Starke*, 62 F.3d 1374, 1381 (11th Cir. 1995). The same reasoning applies here, given the District Court's overall instruction and its specific instruction on the elements of the offense.

As indicated at the beginning of this section, Flores further contends that the District Court's instruction on willful blindness impermissibly shifted the burden to him of "show[ing]" that he "actually believed" that Altamirano was not engaged (or that Flores "positively did not know" he was involving himself) in money laundering or structuring activity. Although the District Court properly stated the burden of proof in its written jury instruction, it orally charged the jury as follows:

> If the *defendant* shows you that he actually believed that money laundering was not taking place, he cannot be convicted. . . . However, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of facts which indicate that there is a high probability that illegal activity is going on.

> * * *

> To repeat, again, if the evidence shows that he positively did not know he was involving himself in money laundering or money structuring, then, of course, he must be acquitted. . . . But, if the evidence shows that there was a high probability that he knew something was amiss and that he

17

> failed to take steps to investigate, to find out whether that was true or not, then you may find that he had the guilty knowledge which must be shown for the conviction of the offense of money laundering or structuring currency transactions.

(Emphasis added.)

On the one hand, Flores is correct that, contrary to the District Court's instruction, he was not required to demonstrate, in order to avoid conviction, that he "actually believed" that money laundering and structuring were not taking place. Rather, it was the Government alone that was required to disprove that fact beyond a reasonable doubt. *See United States v. Simon*, 995 F.2d 1236, 1243 (3d Cir. 1993) (reversing conviction where District Court's instruction on alibi may have shifted burden to defendant, who "need only raise a reasonable doubt in the jurors' minds as to whether he was present at the scene of the charged offense at the time the offense was committed"). On the other hand, given that the correct burden of proof was articulated by the District Court in its written jury instructions to which the jurors referred during deliberations, it is apparent that the substitution of "defendant" for "evidence" was merely a one-word slip of the tongue on the part of the District Judge in her oral charge. In any event, this is where defense counsel's failure to object contemporaneously becomes significant–as the mistake could have been resolved immediately. Indeed, counsel's failure to object leaves us with

18

the impression that the misstatement in the oral charge was hardly noticeable.

Moreover, as the Government points out, the District Court gave general instructions regarding the Government's burden of proof, specific detailed instructions regarding the Government's burden of proof with respect to each element of the crime, and specific references to the Government's burden of proof in the willful blindness charge itself. The Court generally instructed the jury:

> The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This *burden never shifts to a defendant*; for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or testifying himself or producing any evidence.

(Emphasis added.) The Court's charge on the defendant's knowledge indicated: "The Government must prove beyond a reasonable doubt that the defendant acted knowingly and willfully with respect to each and every count in the indictment." Further, in reciting the elements of the crime, the Court again indicated that the Government alone bears the burden of proof. Finally, in the willful blindness charge, immediately prior to its oral misstatement the District Court indicated that the Government bears the burden of proof with respect to Flores' knowledge:

19

So with respect to the issue of the defendant's knowledge, if you find, beyond a reasonable doubt, from all the evidence in the case, that the defendant was subjectively aware of a high probability of the existence of a fact and deliberately tried to avoid learning whether the fact was true, you may find that the Government has satisfied its burden of proving the element of knowledge of that fact.

At the risk of "piling on," the Court's willful blindness charge included repeated references that the jury could not find knowledge based on a willful blindness theory unless there was "proof beyond a reasonable doubt" that Flores "was personally aware of a high probability of the existence of a particular fact, and then deliberately failed to take action to determine whether or not the fact existed."

All of this was more than sufficient to dispel any possible misconception that Flores bore a burden to prove that he was not willfully blind. *See United States v. Lee*, 991 F.2d 343, 349-50 (6th Cir. 1993) (willful blindness instruction did not improperly shift the burden of proof to the defendant, even though it did not instruct that the Government had the burden to prove beyond a reasonable doubt the factual predicates for willful blindness); *United States v. Cincotta*, 689 F.2d 238, 243-44 (1st Cir. 1982) (no plain error regarding the district court's willful blindness instruction that appeared to shift the

20

burden of proof to a defendant, given the totality of court's instructions); *United States v. Ciampaglia*, 628 F.2d 632, 642 (1st Cir. 1980) (willful blindness instruction, read in totality, would not have been construed by a reasonable juror to impose a burden on defendants to disprove criminal knowledge).[3]

Because the instructions imposed the burden of proof on the Government generally, emphasized that the Government bore the burden of proving guilty knowledge, and repeatedly imposed the burden of proving willful blindness on the Government, Flores has failed to demonstrate that the District Court's willful blindness instruction amounted to plain error.

## C. Was the District Court's non-testifying defendant charge legally sufficient?

At trial, Flores exercised his right under the Fifth Amendment to remain silent by choosing not to testify in his own defense. As a result, the defense asked the Court to charge the jury that "[a] defendant in a criminal case . . . has an absolute right under our Constitution not to testify," that "the fact that the defendant did not testify must not be discussed by you, or considered by you, in any way when deliberating and in

---

[3]Moreover, the portion of the instruction that Flores now challenges did not affirmatively require him to make a showing, but only indicated that if he did make a showing, he could not be found guilty.

21

arriving at your verdict," and that "to consider the fact that the defendant did not testify against the defendant would be a violation of your oath as a juror, and of the defendant's constitutional rights." The District Court's non-testifying defendant instruction provided:

> The law does not require a defendant in a criminal action to take the witness stand and testify. No inferences of guilt may be drawn from the decision of a defendant not to testify. This is his constitutional right. Furthermore, the law never places upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Flores argues that this instruction fails to explain to the jury the full significance of his Fifth Amendment privilege and failed to clarify the constitutional prohibition against consideration of his silence for any purpose. We disagree. This instruction spells out for the jury not only that Flores has a privilege against self incrimination, but that the jury may draw no inference from his decision not to testify. *Portuondo v. Agard*, 529 U.S. 61, 67 (2000); *Griffin v. California*, 380 U.S. 609, 615 (1965) (holding that a criminal defendant must not pay any court-imposed price for the exercise of his right not to testify in his own defense). The instruction further reiterates that the defendant does not bear the burden of producing evidence and calling witnesses. Therefore, it more than fulfills

the requirement that, upon request of a defendant, a court should instruct the jury that no adverse inferences may be drawn from his decision not to testify. Because the District Court's statement of the law is effective, its choice of wording was not an abuse of discretion.

### D. Did the District Court properly charge the jury regarding the theory of Flores' defense?

Flores argues that the District Court erred in failing to charge the jury regarding the theory of his defense. That theory was that Flores had been deceived by Altamirano and thus he was not willfully blind to Altamirano's unlawful activities. Consequently, Flores specifically asked the District Court to charge the jury regarding the theory of the defense by explaining to the jury that

> [a]n act is done "knowingly" if done voluntarily and intentionally, and not *because of deception*, mistake or accident or some other innocent reason. The purpose of adding the word "knowingly" is to ensure that no one will be convicted for an act done *because he was deceived*, or by mistake or accident, or because of some other innocent reason.

The District Court did not include the emphasized language in its charge to the jury. Instead, the District Court instructed:

23

An act is done knowingly, if done voluntarily and intentionally, and not because of mistake or accident, or other innocent reason. The purpose of adding the word knowingly . . . is to insure that no one will be convicted for an act done because of mistake, accident, or other innocent reasons.

In the motion for acquittal hearing, the District Court explained its decision to omit the word "deception" from the charge regarding Flores' knowledge, stating:

I appreciate [the defense's] desire to have deception as one of the strings of circumstances which could be an innocent encounter with criminal culpability. But, deception is not as clear a term as the language that I did use. Deception is a slight nuance because initially Mr. Flores was deceived, I dare say initially there's no question when he met Altamirano he thought Altamirano was a legitimate businessman. At least that was the evidence. But somewhere along the way the jury was convinced, and the Government argued he acquiesced and joined Mr. Altamarino's venture, criminal venture.

So the fact that he may have been deceived at one point does not dispose of the fact finding that the jury had to do. I thought that the

24

language I used was clearer and more specific. But certainly the jury had the opportunity listening to the very eloquent and thorough arguments of counsel in summation. They knew what the defense theory was. It was not a very difficult theory. It was quite simple as [defense counsel] explained it. It was that Mr. Flores didn't know, did not know what Mr. Altamirano was up to. That he was duped.

The jury rejected that perspective. But it was certainly clear as day what the defense theory was.

It is well-settled that the trial judge retains discretion to determine the language of the jury charge. *See United States v. Goldblatt*, 813 F.2d 619, 623 (3d Cir. 1987) ("It is within the sound discretion of the trial judge to determine the particular language to be employed when charging the jury."). So long as the court conveys the required meaning, the particular words used are irrelevant. *United States v. Bailey*, 451 F.2d 181, 183-84 (3d Cir. 1971) (*per curiam*). "The district court is not obligated to use the language the defendant proffers." *United States v. Kapp*, 781 F.2d 1008, 1013 (3d Cir. 1986) (declining to include in the instruction on knowledge that "suspicion does not amount to knowledge").

Moreover, the District Court's choice of language is

25

entirely unlike those cases cited by Flores, in which the trial court failed to instruct a jury at all with respect to a defendant's theory of defense—such as justification, *United States v. Paolello*, 951 F.2d 537, 543-544 (3d Cir. 1991); entrapment, *Mathews v. United States*, 485 U.S. 58, 63 (1988); good faith when bad faith is an element of the offense, *United States v. Murdock*, 290 U.S. 389, 396 (1933), *overruled on other grounds by Murphy v. Waterfront Comm'n*, 378 U.S. 52 (1964)); or intoxication as inhibiting intent, *United States v. Davis*, 183 F.3d 231, 254-55 (3d Cir. 1999). Likewise, this is not a case in which the jury would otherwise not recognize the significance of the evidence of Flores' lack of knowledge.

On point here is our decision in *United States v. Kapp*, which addresses a challenge to a jury instruction much like Flores' challenge. There, a defendant sought a gloss on the District Court's standard knowledge instruction that would address his contention that he suspected, but did not know, that he was involved in a conspiracy. 781 F.2d at 1013. Specifically, he sought inclusion of the phrase "suspicion does not amount to knowledge." *Id*. We held that, in refusing the additional language, the District Court did not abuse its discretion. *Id*. By giving the general instruction on knowledge three times, the Court satisfied the requirement that it charge the jury on the defendant's theory of his defense; it was not required to employ the specific language sought by the defendant. *Id*. Likewise, in our case the District Court clearly instructed the jury multiple times on what would and would not

26

constitute knowledge on the part of Flores.  It was not required to employ the synonym selected by Flores to describe his state of mind, but only to state the law effectively, as it did.

### E.  Did the District Court commit error in sentencing Flores?

At sentencing, the District Court determined that Flores' applicable Guidelines provision for the offenses of conviction was U.S.S.G. § 2S1.1, and thus Flores' base offense level was 20.  The parties stipulated that the value of the laundered funds attributable to Flores for sentencing purposes was $1,288,085, resulting in a five-level increase pursuant to § 2S1.1(b)(2)(F).  In addition, the Court applied a two-level upward adjustment pursuant to § 3B1.3 because Flores used a special skill or abused his position of public and private trust as an attorney.  Moreover, the Court declined to grant a two-level downward adjustment for minor role pursuant to § 3B1.2.  A total offense level of 27, combined with Flores' category I criminal history, resulted in an advisory Guidelines range of 70 to 87 months imprisonment.  Nonetheless, the District Court sentenced Flores to 32 months imprisonment – a term 38 months (and more than 50 percent) below the bottom of the Court's calculated advisory Guidelines range.

Despite this, Flores argues that the Court erroneously calculated his exposure under the Sentencing Guidelines three ways: (1) by using § 2S1.2 instead of § 2S1.1 to calculate his

27

Guidelines range, (2) by imposing a two-level abuse of trust enhancement under § 3B1.3, and (3) by refusing to apply a four-level mitigating role reduction under § 3B1.2(a). We need not reach the merits of any of these contentions, however, because even if we rule that the District Court erred in calculating the advisory Guidelines range in any of the respects asserted by Flores, the error was harmless. Indeed, had Flores received a minor role adjustment or not been held liable for abuse of trust or use of a special skill, the bottom of his Guidelines range would have been 57 months. If Flores' Guidelines range had been calculated under § 2S1.2 instead of § 2S1.1, the bottom of his Guidelines range would have been 51 months. Finally, if Flores had received a minimal role adjustment, the bottom of his Guidelines range would have been 46 months. Even if the District Court erred in all the respects asserted by Flores, his Guidelines range would have been 27-33 months, thus surrounding his 32-month sentence. Moreover, the District Court clearly considered all the factors in 18 U.S.C. § 3553(a) in reaching its sentence and used its discretion in light of these factors, rather than in the application of a specific downward departure, to go below his advisory Guidelines range to identify the appropriate sentence for Flores. In this context, there is no conceivable way Flores can prevail in challenging his sentence.

**F.   Was the sentence imposed by the District Court unreasonable under Booker?**

Flores' final argument is that his sentence was

28

unreasonable under *United States v. Booker*, 543 U.S. 220 (2005).  As mentioned above, the District Court adopted the recommendation of the PSR and determined that there was a "presumptive incarceration sentence of 70 to 87 months" under the Sentencing Guidelines.  The Court concluded, however, that this "kind of sentence was unduly harsh," and opted to impose "something that would be fair in the overall scheme of things." It also acknowledged that "the Supreme Court's *Booker* decision was just last week and the Court is not constrained or harnessed by the Guidelines," and expressed its intent to treat Flores more like his co-defendant, Victoria Hernandez.

Quite properly, the District Court was concerned about sentencing disparities among co-defendants. Section 3553(a)(6) specifically requires the Court to take into consideration "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Nonetheless, Flores argues that he was harmed because the District Court erroneously felt bound by the Guidelines as they had been applied to Hernandez, who received a 30-month term of imprisonment prior to the *Booker* decision. The crux of Flores' argument here is that it is possible that had Hernandez been sentenced after *Booker*, similar to himself, she would have received a sentence less than the 30 months the Court imposed for her under the then-mandatory Guidelines.

There is no evidence in the record that the Court identified Flores' sentence under the misapprehension that

29

Hernandez's Guidelines range was in any way binding upon it. Nor was the District Court unaware that Hernandez's sentence had been calculated before *Booker*. Instead, the District Court compared Flores with his co-defendants and decided to give him a break by reducing his sentence by more than 50 percent to create parity with a far less culpable co-defendant "regardless of the Sentencing Guidelines." Moreover, Flores and Hernandez were not similarly situated because, *inter alia*, Hernandez had been involved in the conspiracy for a shorter time, opened fewer corporations, was not an attorney, and had accepted responsibility and pled guilty rather than going to trial. Furthermore, Hernandez pled to conspiracy to commit money laundering under 18 U.S.C. § 1957, which resulted in a lower base offense level than that of Flores, who was convicted of conspiring to violate 18 U.S.C. § 1956. Thus, to the extent the District Court "erred," it most certainly did so in Flores' favor, and he can hardly complain.

* * * * *

For the reasons provided above, the District Court's ruling on Flores' motion for acquittal/new trial is affirmed and the sentence imposed by the District Court on Flores is reasonable and thus affirmed.

30