**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**vs.**
**EPHREM DARNLEY BREWLEY, D.O.B. 06/18/69, Defendant**

Criminal No. ST-06-CR-402

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

November 16, 2007

CLAUDE E. WALKER, ESQ., Assistant Attorney General, Virgin Islands
Department of Justice, St. Thomas, U.S. Virgin Islands, *Attorney for
the Plaintiff.*

JUSTIN CAINE HARRELL, ESQ., Law Offices of Andrew L. Capdeville, P.C.,
St. Thomas, U.S. Virgin Islands, *Attorney for the Defendant.*

HOLLAR, *Judge*

## MEMORANDUM OPINION

(November 16, 2007)

### I. INTRODUCTION

This matter is before the Court on several post-verdict motions filed by
the Defendant, specifically, Defendant's Motion for Acquittal (*sic*)[1] and
Memorandum of Law in support thereof, as well as a Motion for New
Trial in the Alternative that the Court Does Not Grant Defendant's Motion
for Acquittal (*sic*) and Memorandum of Law in support thereof. In

---

[1]    A "Motion for <u>Judgment of</u> Acquittal" is the appropriate legal term.

response, the People have filed memoranda of law in opposition. For reasons that follow, Defendant's Motion for Acquittal, pursuant to FED. R. CRIM. P. 29, is denied, however, the Defendant's Motion for New Trial, pursuant to SUP. CT. R. 135[2], is granted.

## II. PROCEDURAL POSTURE

On Monday August 6, 2007, this matter came on for jury trial. On August 8, 2007, following the conclusion of the trial, the Jury returned a guilty verdict on each count of the Amended Information, to wit: Embezzlement by Carriers, in violation of V.I. CODE ANN. tit. 14, §§ 1090, 1094(a)(2); and Grand Larceny, in violation of V.I. CODE ANN. tit. 14, § 1083(1). Thereafter, timely post-verdict motions were filed by counsel for the Defendant.

## III. FACTUAL HISTORY

The Defendant was employed as a messenger for Commercial Security, a duly licensed Virgin Islands corporation. Loomis Fargo, a Puerto Rican based company, subcontracted Commercial Security to collect, secure and transport monetary deposits on its behalf, from several St. Thomas area businesses and merchants. One of the said businesses in which Defendant collected bank deposits was from Cingular Wireless, at their locations in Tutu Park Mall. Cingular representatives prepared the bank deposits and placed them into sealed, tamper-proof plastic envelopes <u>prior to</u> Commercial Security's scheduled pick-up. Defendant signed, as the receiving clerk, for the deposit, although he was never given the opportunity to verify exactly what amount of money, if any, was actually placed in the locked, sealed envelope. After completing all the stops on his route, Defendant then traveled, in an armored car chauffeured by a Mr. Denvor Davis, to Banco Popular for deposit. On October 11, 2006, after culmination of several months of investigation into missing deposits for Cingular that were never received by Banco Popular, Defendant Brewley was arrested by Detective Albion George. The facts disclosed that approximately $36,000, alleged to have been signed for by Defendant from Cingular was unaccounted for and never reached the bank.

---

[2] Defendant cites to both SUP. CT. R. 135 and FED. R. CRIM. P. 33 in moving for a new trial. The appropriate rule in this Court is SUP. CT. R. 135 in motioning for a new trial. *See Government of the Virgin Islands v. Baron*, 48 V.I. 88, 93 (V.I. 2006).

Inexplicably, another $9,000 was also unaccounted for from Cingular. At the time the $9000 was unaccounted for from Cingular, Defendant was not working and it was Denvor Davis who, coincidentally was the driver during the time Defendant was charged with failing to make the deposits, was acting in his capacity as a receiving clerk. After a three (3) day trial, the jury returned a verdict of guilty against the Defendant on both counts of the Information.

## IV. ANALYSIS

The two primary issues raised for the Court to resolve are: (1) should Defendant's motion for judgment of acquittal be granted; and/or (2) alternatively should Defendant's motion for new trial be granted.

### A. Defendant's Motion For Judgment Of Acquittal Should Not Be Granted

Under FED. R. CRIM. P. 29, a court is obliged to review a motion for judgment of acquittal in the "light most favorable to the Government" and must determine, as a matter of law, whether there is substantial evidence from which a reasonable jury could have found Defendant guilty. *Government of the Virgin Islands v. George*, 47 V.I. 46 (V.I. 2004) (citing *Walters v. Government*, 172 F.R.D. 165, 171, 36 V.I. 101 (D.V.I. 1997). In making this determination, "the Court must sustain the jury's verdict if a rational jury believing the government's evidence could find beyond a reasonable doubt that the government has proven all elements of the offense." *See Baron*, 48 V.I. at 95. In fact, only where "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. . . ," can the verdict be overturned. *Id.* (quoting *United States v. Anderson*, 108 F.3d 478, 480 (3d Cir. 1997). Moreover, in balancing the role of the jury versus the role of the court, a court "must be ever vigilant in the context of [FED. R. CRIM. P. 29] not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

In considering the testimony of the People's witnesses, the evidence admitted, and the instructions given to the Jury, the Court finds that a rational jury could have found Defendant guilty beyond a

reasonable doubt on both counts. Accordingly, Defendant's motion for judgment of acquittal is denied.

## B. Defendant's Motion For New Trial Should Be Granted

In addressing Defendant's Motion for New Trial[3], the following issues must be resolved: (1) whether the Court erred by admitting Defendant's offer to assume liability and responsibility of the missing deposits by offering partial restitution; (2) whether the Court erred by denying appointment of a handwriting expert to rebut any improper inference that the Defendant forged the manifests or route logs; and (3) whether a miscarriage of justice resulted when the People sought and obtained an arrest warrant for a Denvor Davis, (a.k.a. Denver Davis), on the eve of trial and over a year after the offense was committed, knowing that the Defendant had long since identified Denvor Davis as his potential material witness.

### 1. Standard Of Review For Motion For New Trial

█ Though left to the sound discretion of the trial court, a new trial may be granted for two separate but distinct reasons. *Baron*, 48 V.I. at 93. In the first instance, a new trial may be granted "if, after weighing the evidence [the Court] determines that there has been a miscarriage of justice." *Id.* (quoting *Government of the Virgin Islands v. Commissiong*, 706 F. Supp. 1172, 1184 (D.V.I. 1989)). This occurs where the verdict was irrational or that the jury's verdict was "against the weight of the evidence." *Id.* In the second instance, a new trial is warranted where a trial error, within "reasonable probability" had a "substantial influence" on the jury verdict. *Id.* Unlike a motion for judgment of acquittal, which is governed by FED. R. CRIM. P. 29, the Court, in a motion for new trial, is afforded much broader discretion. The Court in *United States v. Charles*,

---

[3]  SUP. CT. R. 135. **New Trial.** The Court may grant a new trial to a defendant if required in the interest of justice. The Court may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before, or within two years after, final judgment. A motion for a new trial based on other grounds shall be made within 10 days after finding guilty, or within such further time as the court may fix during the 10-day period. In no event shall this rule be construed to limit the right of a defendant to apply to the court for a new trial on the ground of fraud or lack of jurisdiction.

949 F. Supp. 365, 35 V.I. 306 (D.V.I. 1996) explained the distinction, by holding:

> For a judgment of acquittal to be granted, the court must decide, as a matter of law, that the evidence presented at trial—both direct and circumstantial—was insufficient to support the conviction. In making this decision, the trial court is required to view the evidence in the light most favorable to the prosecution and to draw all reasonable inferences therefrom in the government's favor. Further this decision requires that strict deference be accorded the jury's findings; the court does not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Rather, the relevant inquiry is whether, in light of the evidence, any rational trier or fact could have found the essential elements of the crime beyond a reasonable doubt. "Our task is not to decide what we would conclude had we been the finders of fact; instead, we are limited to determining whether the conclusion chosen by the factfinders was permissible."
>
> The Court is provided somewhat more discretion when judging a [Rule 33] motion for a new trial. Under Rule 33, the court may grant a new trial "in the interests of justice." In assessing such "interest," the court may weigh the evidence and credibility of witnesses; if the court determines that there has been a miscarriage of justice, the court may order a new trial. (*internal citations omitted*) (Emphasis Added).

*Charles*, 949 F. Supp. at 367-368; *see also*, *Government of the Virgin Islands v. Leycock*, 93 F.R.D. 569, 571, 19 V.I. 59 (D.V.I. 1982).

### 2. The Court Erred By Admitting Defendant's Offer To Assume Liability And Responsibility Of The Missing Deposits.

FED. R. EVID. 408 provides as follows:

(a) **Prohibited Use.** Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:

(1) furnishing or offering or promising to furnish—or accepting or offering or promising to accept—a valuable consideration in compromising or attempting to compromise the claim; and

142

(2) conduct or statements in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) **Permitted uses.** This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and providing an effort to obstruct a criminal investigation or prosecution.

In 2006, Rule 408 was amended in order to clarify which offers to compromise and settlements discussions fall within and which offers to compromise and settlement discussions fall outside of the Rule's parameters. The Advisory Committee Notes for the 2006 amendment provide a foundation in understanding when evidence is improperly introduced, admitted and presented to the jury for their consideration during deliberation.[4]

---

[4] FED. R. EVID. 408. 2006 Amendment (eff. December 1, 2006). Rule 408 has been amended to settle some questions in the courts about the scope of the Rule, and to make it easier to read. First, the amendment provides that Rule 408 does not prohibit the introduction in a criminal case of statements or conduct during compromise negotiations regarding a civil dispute by a government regulatory, investigative, or enforcement agency. Where an individual makes a statement in the presence of government agents, its subsequent admission in a criminal case should not be unexpected. The individual can seek to protect against subsequent disclosure through negotiation and agreement with the civil regulator or an attorney for the government.

Statements made in compromise negotiations of a claim by a government agency may be excluded in criminal cases where the circumstances so warrant under Rule 403. For example, if an individual was unrepresented at the time the statement was made in a civil enforcement proceeding, its probative value in a subsequent criminal case may be minimal. But there is no absolute exclusion imposed by Rule 408.

In contrast, statements made during compromise negotiations of other disputed claims are not admissible in subsequent criminal litigation, when offered to prove liability for, invalidity of, or amount of those claims. When private parties enter into compromise negotiations they cannot protect against the subsequent use of statements in criminal cases by way of private ordering. The inability to guarantee protection against subsequent use could lead to parties refusing to admit fault, even if by doing so they could favorably settle the private matter. Such a chill on settlement negotiations would be contrary to the policy of Rule 408.

■ In addressing the pre-amendment scope of Rule 408, the District Court of the Virgin Islands, in *Carmichael v. Government of the Virgin Islands*, 46 V.I. 391 (D.V.I. 2004), held that the trial court's admission of evidence that defendant offered to repay money <u>that she acknowledged taking</u> was not an abuse of discretion. *Carmichael*, 46 V.I. at 407. In *Carmichael*, the defendant was charged with 27 counts of obtaining money by false pretenses and one count of embezzlement, as defined

---

The amendment distinguishes statements and conduct (such as a direct admission of fault) made in compromise negotiations of a civil claim by a government agency from an offer or acceptance of a compromise of such a claim. An offer or acceptance of a compromise of any civil claim is excluded under the Rule if offered against the defendant as an admission of fault. In that case, the predicate for the evidence would be that the defendant, by compromising with the government agency, has admitted the validity and amount of the civil claim, and that this admission has sufficient probative value to be considered as evidence of guilt. But unlike a direct statement of fault, an offer or acceptance of a compromise is not very probative of the defendant's guilt. Moreover, admitting such an offer or acceptance could deter a defendant from settling a civil regulatory action, for fear of evidentiary use in a subsequent criminal action.

The amendment retains the language of the original rule that bars compromise evidence only when offered as evidence of the "validity," "invalidity," or "amount" of the disputed claim. The intent is to retain the extensive case law finding Rule 408 inapplicable when compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim. So for example, Rule 408 is inapplicable if offered to show that a party made fraudulent statements in order to settle a litigation.

The amendment does not affect the case law providing that Rule 408 is inapplicable when evidence of the compromise is offered to prove notice.

The amendment prohibits the use of statements made in settlement negotiations when offered to impeach by prior inconsistent statement or through contradiction. Such broad impeachment would tend to swallow the exclusionary rule and would impair the public policy of promoting settlements.

The amendment makes clear that Rule 408 excludes compromise evidence even when a party seeks to admit its own settlement offer or statements made in settlement negotiations. If a party were to reveal its own statement or offer, this could itself reveal the fact that the adversary entered into settlement negotiations. The protections of Rule 408 cannot be waived unilaterally because the Rule, by definition, protects both parties from having the fact of negotiation disclosed to the jury. Moreover, proof of statements and offers made in settlement would often have to be made through the testimony of attorneys, leading to the risks and costs of disqualification.

The sentence of the Rule referring to evidence "otherwise discoverable" has been deleted as superfluous. The intent of the sentence was to prevent a party from trying to immunize admissible information, such as a pre-existing document, through the pretense of disclosing it during compromise negotiations. But even without the sentence, the Rule cannot be read to protect pre-existing information simply because it was presented to the adversary in compromise negotiations. (Emphasis Added).

under Virgin Islands law. 46 V.I. at 394. The defendant was employed as an office manager and a house-sitter. The facts disclosed that the defendant was entrusted with a checkbook and bank account information, and was responsible for the payment of household and office bills. *Id.* As a result of an investigation by defendant's employer, approximately $10,000 was initially unaccounted for. *Id.* When confronted, defendant admitted to taking the money and offered restitution for the entire amount. *Id.* Defendant repaid $10,000 in two installments. *Id.* However, during the period between the payments, the actual amount of missing money was discovered to be $12,000, an additional $2000 over the initial figure and was never paid. *Id.* This evidence was admitted, despite Rule 408's prohibitions against admitting offers of compromise, because the trial court found that this was not a compromise settlement. 46 V.I. at 404-05. The Court illustrated the parameters of Rule 408 (as it existed prior to the 2006 amendment) by holding that:

> To be applicable, it must be shown that there was: 1) an offer by the defendant; 2) acceptance by the plaintiff; 3) and valuable consideration; 4) in compromise of a disputed claim. The policies underlying Rule 408 favor encouraging out-of-court settlement of disputes by affording assurance that a party will not be later prejudiced by such efforts if the case nonetheless proceeds to trial. This policy is in recognition of the various reasons that motivate parties to settle disputes, short of admitting liability and apart from the merits of the case, such as a desire to avoid the cost and harassment of litigation. Key to the applicability of this rule is the existence of a dispute regarding the validity or amount of the claim and some form of compromise as to that dispute. While commencement of litigation is not necessary to bring such an offer of compromise within the rule, there must nonetheless be shown to be an actual dispute or a difference of opinion regarding the validity or amount of the claim at the time the offer was made. Because a dispute as to the amount and validity of the claim is a foundational requirement for Rule 408's application, payment of the full amount demanded or acknowledgment of the debt has been held not to constitute a compromise offer and is not protected under Rule 408. Such undisputed debts are viewed as contrary to the idea of a compromise or negotiations and do not further the policy of settling disputes. (*internal citations omitted*) (Emphasis Added).

46 V.I. at 405-06. As previously noted, Rule 408 was amended and further clarified, effective December 1, 2006, which changed the practical implementation of the rule in admitting compromise negotiations and offers to settle. Specifically, the amendments clarify a number of points quite applicable in the instant matter. First, there is no absolute prohibition on the admission of statements made to government agents during compromise negotiations. Second, statements made <u>during compromise negotiations of private matters are not admissible,</u> if offered to prove liability, invalidity or amount of the claims in dispute. Third, the rule prohibits both the party attempting to compromise either by an offer to settle or through an admission of fault, and the party to whom the offer to compromise was made, from disclosing the contents of those discussions. These prophylactic measures are intended to ensure that Rule 408 retains the underlying policy of encouraging settlements and admitting fault when necessary. A further distinction arises, because government agents have the ability to negotiate and agree that statements made in settlement discussions and compromise negotiations are not admissible in subsequent criminal matters, whereas private parties cannot prevent such a use, thus Rule 408 imposes an absolute prohibition in the latter.

In the instant matter, the admission or compromise attributed to the Defendant was not subject to disclosure under the "Government Agent" exception because the conversations at issue took place between two private parties, namely Defendant and his employer, Clayton Brown, Owner of Commercial Security. Accordingly, there exists an absolute prohibition to the disclosure of such discussions under the 2006 Amendment. Because counsel for the Defendant made a late "in limine" motion to exclude such at the beginning of the trial, the Court did not properly apply the law and the 2006 Amendment and improvidently admitted such for the Jury's consideration. The testimony disclosed that upon being advised of the missing deposits, Defendant <u>immediately assumed responsibility, in his capacity as the deposit handler,</u> and offered <u>his employer $7,000.00.</u> Although defendant offered reimbursement of the $7,000.00 and took responsibility for the missing funds since he was the custodian of the depository bags, he <u>never admitted taking the money nor admitted any specific fault on his behalf regarding the missing deposits.</u> Furthermore, the amount unaccounted for was $36,000 plus

$9,000, and at no time did Defendant acknowledge responsibility of either of those amounts.[5]

██ In light of the foregoing, *Carmichael* is no longer controlling and has been abrogated by the commentary within the Advisory Committee Notes to Rule 408, which broadened and expanded upon the scope of Rule 408's prohibitions.[6] Thus it was error to admit evidence of any admission by the Defendant. Moreover, the testimony regarding Defendant's acceptance of responsibility to his employer fell outside any other enumerated exception that would allow its admission at trial. As a result, the Jury may have given undue weight to Defendant's acceptance of responsibility and offer to reimburse, which, under the 2006 amendment, was not admissible.

### 3. The Court Erred By Denying Appointment of a Handwriting Expert To Rebut Any Improper Inference That The Defendant Forged the Manifests or Route Logs.

██ On July 24, 2007, the Defendant filed three motions: (1) Motion for Appointment of Counsel, (2) Defendant's Motion for Handwriting Expert, and (3) Motion for Continuance. After providing the Court with additional information, the Court appointed counsel of record since the Defendant could no longer afford to pay his fees. The Court, however, denied the latter two motions. The denials were based upon the final pre-trial hearing, held on August 1, 2007, where the People moved to dismiss the forgery[7] count in the Information. As a result of the dismissal of that count, the Court erroneously believed that a handwriting expert would not be necessary, since the People would not be seeking to verify and/or prove that Defendant forged any signatures. Much to the Court's

---

[5]    During the trial, it became apparent that the computations on the manifests were erroneously calculated in many instances.

[6]    In *Carmichael* the Court held that if the debt was undisputed, then any payment of or offer to reimburse the debt would not constitute a compromise offer or a settlement negotiation and would be admissible. *Carmichael*, 46 V.I. at 405-06. However, the 2006 amendment reflected a change to broaden nondisclosure, regardless of whether the claims were disputed or not, in order to encourage settlements, and to promote private parties to admit fault, without fear that such representations would be used against them in a subsequent criminal trial. *See* n. 4.

[7]    One (1) count of forgery, in violation of V.I. CODE ANN. tit. 14, § 791(2), was originally one of the counts in the Information.

chagrin, however, during the trial, the People introduced the testimony of two (2) representatives from Banco Popular, who identified manifests given to them by the Defendant to which they had accepted and signed. However, these same representatives also identified other manifests, which were the subject of the prosecution, that they testified were not accepted nor signed by them. In the fact, the representative unequivocally disclaimed that the signature that appeared on the manifest was their own. The Jury was therefore left to infer that the signature that appeared therein had been forged by the Defendant. Without a handwriting expert to establish that the signatures that appeared on the manifests and disclaimed by the Bank representatives were not the Defendant's signature, the Defendant was left without a meaningful opportunity to defend against the inference and suggestion that the Defendant forged the documents. The Court now realizes that Defendant's initial argument, regarding the need for a handwriting expert, was indeed meritorious because the bank representatives were able, whether unwittingly or not, to testify that somebody signed their names on the manifest, reflecting that they, on behalf of the Bank, received the bank deposits, when they did not. Since the Defendant was the party responsible for the safe-keeping of the depository bags, an impermissive and prejudicial inference may have been drawn by the Jury against the Defendant as the one who forged the documents, and *a fortiori,* culpable with respect to embezzlement by carrier and grand larceny.

### 4. A Miscarriage Of Justice Resulted When The People Sought And Obtained An Arrest Warrant For A Denvor Davis, (a.k.a. Denver Davis), On The Eve Of Trial And Over A Year After The Offense Was Committed, Knowing That The Defendant Had Long Since Identified Denvor Davis As His Potential Material Witness.

On August 6, 2007, the first day of trial, the Court was made aware that an arrest warrant along with an affidavit prepared by Detective Albion George, alleging the same crimes, during the same time period as Defendant, were committed by Denvor Davis (a.k.a. Denver Davis).[8] On

---

[8] The affidavit in support of the arrest warrant is replete with highly suspect information, including: (1) the date that the Officer was assigned to investigate the case on both matters are stated as Tuesday July 18, but with different years, 2006 for Brewley and 2007 for Davis,

the eve of Jury Selection issuance of an arrest warrant for Denver Davis was sought by the People and authorized on August 2, 2007. On October 3, 2007, via People's Informational Motion to the Court and the Defendant, the Court was notified that Denvor Davis was being held by the State of Virginia on a warrant issued by the U.S. Virgin Islands and is currently awaiting extradition to answer for the aforementioned charges. The Court is troubled by and is concerned with the motivation of the People to pursue an arrest of Mr. Davis only on the eve of trial, particularly when Mr. Davis was previously identified, over a year prior to trial, as a witness for the Defendant.[9] Furthermore, at trial, the evidence revealed that Mr. Davis was the driver of the armored vehicle on the days and shifts that the deposits were collected by Defendant from various businesses. Moreover, the evidence introduced Mr. Davis as the individual who maintained the route logs, which kept a history of the stops made and the number of deposits received. Additionally, the testimony disclosed that the designed security measures in the armored vehicle that separated Defendant and the deposits collected by him from the driver (i.e. Denvor Davis) were inoperative due to the defective doors, and often times Defendant placed the deposits in the unsecured passenger compartment of the armored vehicle, giving Denvor Davis ample opportunity to take the deposits or forge any of the manifests while Defendant was making subsequent pick-ups. Given the foregoing, the impetus behind People's application for an arrest warrant of Denvor Davis on the eve of trial is highly suspect. Whatever the People's motivation, their actions resulted in manifest injustice to the Defendant by

respectively; (2) according to the affidavit in support of the arrest warrant for Denvor Davis, the embezzlement case occurred over a period of months starting from December 5, 2005 to April 12, 2006 (the exact period recited in the affidavit for Defendant's arrest), yet both counts alleged against Denvor Davis fell outside that period, April 17, 2006 and January 13, 2007; and (3) the latter affidavit for Davis alleges facts that were either known or should have been known to the investigating officer regarding Davis' status as Defendant's driver, at the time the affidavit in support of Defendant's arrest was prepared and filed.

[9] From the outset, it was apparent that Denvor Davis was at the very least an aider and abetter, a co-conspirator or an accomplice after the fact, yet nothing was affirmatively done until it appeared that the Defendant may have used Denvor Davis effectively to cast a reasonable doubt as to his culpability. Then and only then did the People initiate Denvor Davis' arrest based on the same information with which they arrested the Defendant, almost a year later. By seeking Denvor Davis' arrest, the Defendant was effectively precluded from using him since Mr. Davis could and most likely would have invoked his Fifth Amendment Rights.

effectively eliminating Mr. Davis' appearance, even if he could have been located within the jurisdiction.

## V. CONCLUSION

Viewing the instructions provided by the Court to the Jury, the exhibits and testimony admitted into evidence in the light most favorable to the People and drawing all reasonable inferences therefrom in the prosecutor's favor, there existed substantial evidence from which a rational jury could find the Defendant guilty beyond a reasonable doubt. Ergo, Defendant's motion for judgment of acquittal is denied.

However, in retrospect, the Court erred: (1) by improvidently admitting evidence of Defendant's offer to reimburse and assume liability of $7,000.00 of the $36,000 plus $9,000.00 in missing funds, in derogation of FED. R. EVID. 408, as amended in 2006; and (2) by denying the Defendant's request to retain a handwriting expert to rebut the inference that the forged signatures of bank representatives on the manifests were executed by the Defendant. As a result, within a "reasonable probability," these trial errors had a "substantial influence" on the verdict. Moreover, a miscarriage of justice resulted when the People sought and obtained an arrest warrant for Denvor Davis on the eve of trial and over a year after the offense was committed, knowing that Defendant had long since identified Denvor Davis, as his material witness. Accordingly, Defendant's motion for a new trial is granted.